FILED
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

APR 0 8 2022

TAMMY H. DOWNS, CLERK
By:_____ DEP CLERK

**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION**

**LARRY CURTIS and MARGIE CURTIS,
As Guardian(s) of HUNTER W. CURTIS**                     **PLAINTIFFS**

**vs.**                     Case No: 4:22cv328-LPR

**LARRY TAYLOR, INDIVIDUALLY AND IN HIS CAPACITY
AS MONROE COUNTY JUDGE, BILLY BURRIS, INDIVIDUALLY
AND IN HIS OFFICIAL CAPACITY, ASA HUTCHINSON, IN HIS
CAPACITY AS GOVERNOR OF THE STATE OF ARKANSAS**      **DEFENDANTS**

### COMPLAINT

COMES the Plaintiffs, **LARRY CURTIS and MARGIE CURTIS**, as **Guardian(s) of HUNTER W. CURTIS**, by and through counsel, Luther Oneal Sutter, **SUTTER & GILLHAM, P.L.L.C.**; and, for this Complaint each states:

### PARTIES AND JURISDICTION

1.      Plaintiffs are the guardians of Hunter Curtis. Plaintiffs' ward Hunter Curtis (hereinafter "Plaintiff"), is a resident and citizen of the State of Arkansas, who has been incarcerated in the Monroe County Jail because Defendants fail and refuse to implement an Olmstead or otherwise assure compliance with the ADA and Section 504. Larry Taylor is duly acting and appointed Monroe County Judge who is sued in his official and individual capacity for failure to fund the Sheriff's department and ensure his policies provide inmates with disabilities program access. Mr. Burris is the Assistant Director of Children & Forensic Services Division of Mental Health Services, who is sued in his official and individual capacity. Asa Hutchinson is the Governor of the State of Arkansas, who is sued in his official capacity for prospective injunctive relief. This is an action brought for violation of Plaintiff's right to medical care under the ACRA of 1993. Accordingly, Plaintiff brings this action as allowed by the ACRA

This case assigned to District Judge _Rudofsky_
and to Magistrate Judge _Kearney_

of 1993, ACA 16-118-107, and 42 U.S.C.§1983, as well as Title II of the Americans with Disabilities Act and Section 504 of the Rehabilitation Act of 1973, as amended. This Court has personal and subject matter jurisdiction, since Monroe County is a public agency employing more than fifty (50) people and receives federal financial aid. Venue is proper. All actions were taken under color of law, and the jail has received and distributed federal funds in 2018 to present. Plaintiff is currently incarcerated in the Monroe County Jail by virtue of a conviction in Monroe County District Court.

## **GENERAL ALLEGATIONS OF FACTS**

2.      Plaintiff, for no good reason in November of 2016, was stopped by Chief Rash placed under arrest.

3.      Plaintiff then transported to the Monroe County Jail, where he was strapped to the restraint chair for hours on end without any bathroom breaks, causing him to soil himself because Plaintiff suffers from as mental illness.

4.      Plaintiff suffers from as mental illness that permanently and substantially impairs his ability to think and communicate. Monroe County and the State of Arkansas are each recipients of federal financial aid and therefore governed by Section 504 of the Rehabilitation Act of 1973.

5.      Plaintiff is currently incarcerated in the Monroe County jail and was incarcerated in the Monroe County Jail on the following dates:

07/05/16;   09/18/16;12/21/16;   03/11/17;   05/08/17;   05/25/17;   05/30/17;   06/02/17; 06/23/17; 10/31/17; 01/07/19; 05/14/19; 08/28/19; and 09/17/19.

6.      On each occasion in 2019, Plaintiff was restrained, inappropriately, and he was not given any appropriate care under the supervision of a physician, despite the knowledge that

he has serious medical condition(s), including schizophrenia because Billy Burris refused to admit Plaintiff into the Arkansas State Hospital.

7.     Plaintiffs brought suit against the Monroe County Sheriff, and that claim was settled.  Such lawsuit was noticed to Judge Taylor of his violations of federal and state law.

8.     Now, Plaintiff is incarcerated in the Monroe County jail.

9.     Recently, the Sheriff of Monroe County contacted the undersigned and advised that his facility was incapable of caring for Plaintiff, saying Mr. Burris had denied transport to the Arkansas State Hospital because of inadequate bad space.

10.     The Sheriff expressed concern about Plaintiff's health and requested assistance.

11.     Upon information and belief, Judge Taylor intends to further cut funding to the Monroe County Jail further injuring Plaintiff, unless this Court acts.

## COUNT I- DUE PROCESS/ADA/REHAB ACT

12.     Plaintiff realleges the foregoing against Defendants, as if fully set out herein.

13.     Defendants' methods of administering the State's Medicaid program and its forensic psychiatric program have put Plaintiff at risk of unnecessary institutionalization.

14.     In particular, defendants have allegedly failed to arrange for medically necessary and authorized transition services "by failing to establish and implement meaningful and effective policies, practices, and procedures to administer this benefit."   As a result, plaintiffs allege they are at serious risk of unnecessary institutionalization in the form of hospitalizations or admissions to another institution

15.     Congress enacted the ADA "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities."  42 U.S.C. § 12101(b)(1). It found that, "historically, society has tended to isolate and segregate individuals

with disabilities" and that "individuals with disabilities continually encounter various forms of discrimination, including ... segregation." 42 U.S.C. §§ 12101(a)(2) and (5). Congress determined that "the Nation's proper goals regarding individuals with disabilities are to assure equality of opportunity, full participation, *independent living*, and economic self-sufficiency for such individuals." 42 U.S.C. § 12101(a)(7) (emphasis added). Title II of the ADA prohibits disability discrimination in public services: "[N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.

16.     Congress directed the Attorney General to promulgate regulations to implement Title II. 42 U.S.C. § 12134. These regulations require public entities, *inter alia*, to "administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities." 28 C.F.R. § 35.130(d) ("the integration mandate"). The "most integrated setting" is one which "enables individuals with disabilities to interact with nondisabled persons to the fullest extent possible." 28 C.F.R. pt. 35, app. B at 690 (2015). The regulations also require public entities "make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity." 28 C.F.R. § 35.130(b)(7).

17.     In *Olmstead*, the Supreme Court held that, under the ADA and its regulations, "unjustified institutional isolation of persons with disabilities is a form of discrimination." *Olmstead v. L.C.*, 527 U.S. 581, 600 (1999). The Court reasoned that "institutional placement of persons who can handle and benefit from community settings perpetuates unwarranted

assumptions that persons so isolated are incapable or unworthy of participating in community life." *Id.* The Court concluded that individuals with disabilities are entitled to community-based services "when the State's treatment professionals determine that such placement is appropriate, the affected persons do not oppose such treatment, and the placement can be reasonably accommodated, taking into account the resources available to the State and the needs of others with . . . disabilities." *Id.* at 607 (plurality opinion).

18.    States must make the requested modifications unless they can prove the modifications' unreasonableness by establishing that the modifications would fundamentally alter the services they provide (*i.e.*, the fundamental alteration defense). The Supreme Court explained, "Sensibly construed, the fundamental-alteration component of the reasonable-modifications regulation would allow the State to show that, in the allocation of available resources, immediate relief for the plaintiffs would be inequitable, given the responsibility the state has undertaken for the care and treatment of a large and diverse population of persons with . . . disabilities." *Id.* at 604 (plurality opinion).

19.    Defendants may argue that plaintiffs' Title II claim should be dismissed because plaintiffs have not alleged "improper conduct" by defendants or disparate treatment relative to other citizens. But plaintiffs need not allege improper conduct or disparate treatment to state a violation of Title II's integration mandate.

20.    By its terms, Title II's integration mandate imposes an affirmative obligation on public entities to "administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities." 28 C.F.R. § 35.130(d). Reflecting this affirmative obligation, the Supreme Court held in *Olmstead* that unnecessary segregation is itself a form of discrimination under Title II.

21.    As a result, the Court found that a public entity violates Title II when it fails to provide community-based services to persons with disabilities when (1) such services are appropriate; (2) the affected persons do not oppose community-based treatment; and (3) community-based services can be reasonably accommodated "taking into account the resources available to the State and the needs of others with ... disabilities." *Id.* at 607 (plurality opinion); *see also id.* at 611 (Kennedy, J., concurring) (noting plaintiffs made "no allegation that Georgia officials acted on the basis of animus" but recognizing plaintiffs could show discrimination even without such alleged animus); *see also, e.g., United States v. Mississippi*, 400 F. Supp. 3d 546, 554 (S.D. Miss. 2019) ("Where a defendant fails to meet this affirmative obligation, the cause of that failure is irrelevant." (quoting *Bennett-Nelson v. La. Bd. of Regents*, 431 F.3d 448, 454-5 (5th Cir. 2005))). The Court in *Olmstead* also squarely rejected the argument that plaintiffs must identify a "comparison class" of "similarly situated individuals given preferential treatment" to state a violation of the integration mandate. 527 U.S. at 598 & n. 10 because there is no Olmstead plan. Plaintiff is in jail but jail is not appropriate placement.

22.    Individuals with disabilities need not wait until they are institutionalized to assert a claim under Title II's integration mandate. 28 C.F.R. § 35.130(d). Individuals with disabilities at serious risk of unnecessary institutionalization may state a claim for violation of Title II's integration requirement.

23.    By their terms, neither Title II nor the integration mandate applies only to institutionalized individuals. Instead, the plain text of each protects the rights of all "qualified individuals with a disability." 42 U.S.C. § 12132; 28 C.F.R. § 35. 130(d). A District Court has recognized the viability of at-risk claims. *See Hiltibran v. Levy*, 793 F. Supp. 2d 1108, 1114

(W.D. Mo. 2011) ("Persons at risk of institutionalization may make an integration mandate challenge without having first been placed in institutions.").

24.     Every court of appeals to have addressed this issue has likewise recognized that Title II applies to persons with disabilities who are at serious risk of institutional placement. *See Steimel v. Wernert*, 823 F.3d 902, 911-12 (7th Cir. 2016) (rejecting the argument that the integration mandate applies only to people who have been institutionalized); *Davis v. Shah*, 821 F.3d 231, 263 (2d Cir. 2016) ("[A] plaintiff may state a valid claim for disability discrimination by demonstrating that the defendant's actions pose a serious risk of institutionalization for disabled persons."); *Pashby v. Delia*, 709 F.3d 307, 322 (4th Cir. 2013) ("[I]ndividuals who must enter institutions to obtain Medicaid services for which they qualify may be able to raise [a] successful Title II … claim[] because they face a risk of institutionalization."); *M.R. v. Dreyfus*, 697 F.3d 706, 734 (9th Cir. 2012) ("An ADA plaintiff need not show that institutionalization is 'inevitable' or that she has 'no choice' but to submit to institutional care in order to state a violation of the integration mandate. Rather, a plaintiff need only show that the challenged state action creates a serious risk of institutionalization."); *Fisher v. Oklahoma Health Care Auth.*, 335 F.3d 1175, 1181-82 (10th Cir. 2003) (rejecting the argument that individuals with disabilities who "stand imperiled with segregation [because of state policy] may not bring a challenge to that state policy under the ADA's integration regulation without first submitting to institutionalization"). As these courts reasoned, the integration mandate would be meaningless if plaintiffs were required to segregate themselves by entering an institution before they could challenge an allegedly discriminatory law or policy that threatens to force them into segregated isolation. *E.g., Davis*, 821 F.3d at 263; *Fisher*, 335 F.3d at 1181.

25.    Moreover, at-risk claims under Title II's integration mandate by their nature satisfy all of the requirements for standing, including an injury-in-fact, because they involve threats to health, safety, and welfare: a plaintiff typically alleges (1) either an actual injury from an existing denial of services or an imminent injury from a threatened cut to services, (2) caused by the defendant, (3) that would be redressed if the defendant's actions were enjoined. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (to satisfy the "injury in fact" requirement for standing, a plaintiff must identify an injury that is "actual or imminent, not conjectural or hypothetical").

26.    Plaintiff has alleged and presented facts in support of his motion for a preliminary injunction that he is suffering an actual injury in fact and are at serious risk of unnecessary institutionalization or death. They allege ongoing actual injury in the form of the lack of medically necessary services.

27.    Defendants cannot dispute that plaintiffs are unable to obtain the appropriate services that have been authorized as medically necessary,

28.    Plaintiff is at serious risk of future unnecessary institutionalization because of this lack of services, even if he is released.

29.    Plaintiff will suffer an irreparable harm in the absence of injunctive relief because plaintiff's alleged serious risk of segregation is not speculative and is linked causally to a lack of appropriate services

30.    In *Olmstead*, the Supreme Court recognized the harm that results from unnecessary institutionalization. 527 U.S. at 601. The Court noted that "institutional confinement severely diminishes the everyday life activities of individuals, including family relations, social contacts, work options, economic independence, educational advancement, and

cultural enrichment." 527 U.S. at 601. Following *Olmstead*, numerous courts have held that the harms caused by unnecessary segregation can constitute irreparable harm for the purposes of granting an injunction. *E.g.*, *L.S. v. Delia*, No. 11-0354, 2012 WL 12911052 at *14-15 (E.D.N.C. Mar. 29, 2012); *Pashby v. Cansler*, 279 F.R.D. 347, 355 (E.D.N.C. 2011); *Haddad v. Arnold*, 784 F. Supp. 2d 1284, 1307 (M.D. Fla. 2010); *Marlo M. v. Cansler*, 679 F. Supp. 2d 635, 638 (E.D.N.C. 2010); *Crabtree v. Goetz*, No. 08-0939, 2008 WL 5330506, at *25 (M.D. Tenn. Dec. 19, 2008); *Long v. Benson*, No. 08-0026, 2008 WL 4571903, at *2 (N.D. Fla. Oct. 14, 2008).

31.     This principle applies equally to the irreparable harm threatened by serious risk of unnecessary segregation. In *M.R.*, the Ninth Circuit, reversing a lower court's denial of a motion for preliminary injunction in a Title II case, held that plaintiffs had demonstrated a likelihood of irreparable injury by showing that state actions would deprive plaintiffs of medically necessary care and thus place plaintiffs at serious risk of institutionalization. 697 F.3d at 726.

32.     The lower court had denied plaintiffs' request for a preliminary injunction, in part because it found that plaintiffs' deteriorating medical conditions, and other problems not attributable to the state, contributed to their risk of institutionalization. *Id.* The Ninth Circuit rejected this reasoning, explaining that plaintiffs need not show that the risk of institutionalization is "exclusively attributable" to, *id.* at 726, or exclusively caused by the challenged state action. *Id.* at 730. Thus, evidence that defendants' failure to provide adequate services would exacerbate plaintiffs' medical conditions and put plaintiffs at serious risk of segregation demonstrated a likelihood of irreparable injury. *Id.* at 733.

33.     Courts have also held in other cases brought under Title II's integration mandate that plaintiffs may suffer irreparable harm even if faced with only temporary segregation.

In *Marlo M.*, the court issued a preliminary injunction to halt a proposed termination of funding for the services that plaintiff, adults with developmental disabilities and mental illness who had been living in their own homes for years, relied on to stay in their homes. 679 F. Supp. 2d at 637. The court held that evidence showing that plaintiffs "will suffer regressive consequences if moved, even temporarily" demonstrated irreparable harm. *Id.* at 638. Likewise, in *Haddad*, the court found that plaintiff had established risk of irreparable injury if required to enter a nursing home, based on a declaration from plaintiff's physician stating that such a placement would be detrimental to plaintiff's health and well-being. 784 F. Supp. 2d at 1307 . In *L.S. v. Delia*, the court held that affidavits describing effects of the state's failure to provide adequate services—including the threat of institutionalization and serious physical and mental injury resulting from "forced entry into an institutional setting"—established irreparable harm. 2012 WL 12911052 at *14-15. And in *Long v. Benson*, the court held that "each day [plaintiff] is required to live in the nursing home will be an irreparable harm" because plaintiff had shown that his perceived quality of life in the nursing home would be worse than at the plaintiff's own home. 2008 WL 4571903 at *2.

34.     Plaintiff is currently experiencing irreparable harm in the form of unmet medical needs and are at serious risk of suffering further irreparable harm in the form of unnecessary segregation. The purpose of a preliminary injunction is to *prevent* irreparable harm. *E.g.*, *Devose v. Herrington*, 42 F.3d 470, 471 (8th Cir. 1994) (per curiam); *Dataphase Sys. v. C L Sys.*, 640 F.2d 109, 113 n. 5 (8th Cir. 1981); *see also Winter v. NRDC, Inc.*, 555 U.S. 7, 22 (2008) ("Our frequently reiterated standard requires plaintiffs seeking preliminary relief to demonstrate that irreparable injury is *likely* in the absence of an injunction").

## COUNT II- ADA/REHAB ACT

35. Plaintiff realleges the foregoing against the official capacity Defendants only as if fully set out herein.

36. Defendants had a duty to ensure that Plaintiff, and other individuals, had program access under Title II of the ADA and the REHAB ACT of 1973. But they failed by refusing to enact policies that recognized that persons with disabilities have impairments that require regular monitoring by a medical provider. On July 12, 1990, Congress enacted the Americans with Disabilities Act, 42 U.S.C. § 12101, et seq., establishing the most important civil rights for persons with disability in our country's history.

37. The Congressional statutory findings include:

a. Some 43,000,000 have one or more physical or mental disabilities....; and,

b. Historically, society has tended to isolate and segregate individuals with disabilities and, despite some improvements, some forms of discrimination against individuals with disabilities continue to be a continuous and pervasive social problem.

38. Congress gave public entities over a decade to self-evaluate and to implement the Act. The effective date was January 26, 1992.

39. Nevertheless, Defendants failed to properly self-evaluate and failed to make those changes in order to assure program access as herein alleged.

40. Title II of the ADA covers public entities. 42 U.S.C. § 12181, et seq. Specifically, Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subject to discrimination by such entity." 42 U.S.C. § 12132. The ADA defines "public entity" in relevant part as "any State or local government" or "any department, agency, special purpose district, or other instrumentality of a

State or States or local government." 42 U.S.C. § 12131(1)(A)-(B), and the Supreme Court has found that "[s]tate prisons fall squarely within the [statute's] definition of public entity." *Pennsylvania Dep't of Corrections v. Yeskey*, 524 U.S. 206, 210, 118 S.Ct. 1952, 141 L.Ed.2d 215 (1952) (internal quotations and citations omitted). Section 504 of the Rehabilitation Act states that "[n]o otherwise qualified handicapped individual in the United States ... shall, solely by reason of his handicap, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794. Both the ADA and the Rehabilitation Act have been found to apply to services, programs and activities for detainees.

41. Monroe County and the State of Arkansas each is a public entity within the meaning of Title II and Section 504 because each receives federal financial aid.

42. The placement was not appropriate, and Defendants failed to take proper steps to evaluate Plaintiff. Namely, Plaintiff alleges that those policies and practices include but are not limited to, the following:

Failure to conduct appropriate and complete assessments;
Failure to create and implement appropriate health treatment plans;
Failure to follow clinical judgments and recommendations;
Failure to promptly evaluate and transfer inmates to a hospital who are gravely disabled and at risk of serious harm;
Failure to implement appropriate emergency treatment policies;
Failure to provide appropriate staffing and training at the Jail to provide minimally adequate treatment for seriously ill inmates.

These failures are a result of Defendants' failure to self-evaluate and reviews its policies under 28 CFR 35.130. The policy of avoiding physician appointments to save medical expenses has a disparate impact upon persons with disabilities.

43.    As alleged above. the Defendant's facilities are not in compliance with the ADA. codified at 42 U.S.C., § 12101. et seq. and the federal regulations promulgated pursuant to the ADA.

44.  Defendants have failed to evaluate its policies and procedures in order to eliminate those policies and procedures which discriminate unfairly against Plaintiff and to provide Plaintiff program access.  Inmates without disabilities were not endangered by these policies, but Plaintiff was.

45.  Plaintiff, given his mental and physical impairments such as depression had a disability which substantially impairs one or more major life activities such as thinking and concentrating and was an otherwise qualified individual, within the meaning of the ADA and Section 504.

46.   By failing to make those changes which are readily achievable. the Defendant intentionally discriminated against Plaintiff in violation of 42 USC § 12112.

47.  As a result of the failure to self-evaluate, Plaintiff was denied his right to program access, causing him unnecessary pain and suffering.

48.  By virtue of the facts alleged herein, Plaintiff is a person with a disability, as that term is defined by the ADA and Section 504 of the Rehabilitation Act of 1973.

49.  Defendants have failed to complete a self-evaluation, in accordance with Section 504 of the Rehabilitation Act of 1973, as well as with Title II of the Americans With Disabilities Act of 1990, in order to determine whether or not its programs and policies unlawfully discriminate against persons with mental disabilities.

50.    As a direct and proximate cause of Defendants' failure to conduct such self-evaluation, Plaintiff is incarcerated in a facility where he cannot be treated and where he was a danger to himself and others, which ultimately may lead to his death.

51.    Accordingly, Plaintiff alleges that Defendants have discriminated against him, an individual with a disability, on the basis of his disability, in violation of Section 504 of the Rehabilitation Act of 1973 and Title II of the Americans With Disabilities Act of 1990.

52.    As a direct and proximate cause of Defendant's acts or omissions as alleged herein, Plaintiff has suffered severe mental, emotional, and physical distress, and incurred expenses that would not otherwise have been incurred.

53.    Defendants' actions have been so egregious so as to warrant the imposition of punitive damages.

54.    As a direct and proximate cause of Defendants' acts and omissions alleged herein, died, resulting in loss of life, loss of enjoyment of life, and hedonic damages.

## COUNT III

55.    Plaintiff realleges the foregoing, as if fully set out herein, against State Defendants, Burris & Hutchinson.

56.    Despite having notice of the critical need, State Defendants allowed an unconstitutional system of incarceration of pretrial detainees who were mentally ill, without due process of law.

57.    In fact, State Defendants allowed services and facilities to be closed, in a conscious effort to cut costs at the expense of citizens', such Plaintiff's, rights granted under the Eighth and Fourteenth Amendments to the United States Constitution.

58.    Accordingly, Plaintiff alleges that the State Defendants created and implemented a policy that directly resulted in the denial of medical care to persons with mental illness, such as Plaintiff, resulting in deliberate indifference to Plaintiff's, and others', serious medical needs.

59.    As a result of State Defendants' inaction, Plaintiff suffered, and is suffering now,

from severe mental, emotional, and physical distress, mental anguish, disability, and humiliation.

## JURY DEMAND

60. Plaintiff requests a trial by jury.

**WHEREFORE,** Plaintiffs pray for a declaratory judgment that Defendants' actions have violated Plaintiff's rights granted to him under the Fourteenth and 8th Amendments to the United States Constitution, the ADA, Section 504, and the Arkansas Constitution, for appropriate compensatory and punitive damages against Defendant exceeding one million dollars, for an injunction stopping the practice of allowing for an Order stopping the practice of jailing persons with disabilities, for reasonable attorneys' fees, for costs, for a jury trial and for all other proper relief.

Respectfully submitted,

**SUTTER & GILLHAM, P.L.L.C.**
Attorneys at Law
P.O. Box 2012
Benton, AR 72018
501-315-1910 Office
501-315-1916 Facsimile
Attorney for the Plaintiff

By:    */s/ Luther Oneal Sutter*
Luther Oneal Sutter, AR Bar No. 95031
luther.sutterlaw@gmail.com
*Counsel for Plaintiffs*